2024 IL App (4th) 230641

NO. 4-23-0641

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
September 17, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | McLean County |
| RANDY MARTEZ TURNER, | ) | No. 22CF530 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | William A. Yoder, |
| | ) | Judge Presiding. |

JUSTICE DOHERTY delivered the judgment of the court, with opinion.
Presiding Justice Cavanagh and Justice Zenoff concurred in the judgment and
opinion.

**OPINION**

¶ 1        Defendant Randy Martez Turner was convicted of several offenses arising out of a
routine traffic stop, at which he attacked Illinois State Police trooper Matthew Niehaus. On appeal,
defendant argues that (1) his conviction for disarming a peace officer (720 ILCS 5/31-1a(a) (West
2022)) should be reversed because the pepper spray he took from Niehaus was not a "weapon" for
purposes of that statute and (2) his 44-year sentence is excessive. We disagree and affirm.

¶ 2                              I. BACKGROUND

¶ 3                        A. The Charges Against Defendant

¶ 4        Defendant was charged with 10 offenses based on the traffic stop incident
referenced above, including one count of disarming a peace officer (*id.*) for taking Niehaus's

pepper spray, a Class 1 felony (count I); one count of attempting to disarm a peace officer (*id.* § 31-1a(b)) for attempting to take Niehaus's gun, a Class 2 felony (count II); and one count of aggravated battery of a peace officer (*id.* § 12-3.05(d)(4)) for striking Niehaus, a Class 2 felony (count III).

¶ 5                              B. Trial Evidence

¶ 6        The trial court held a bench trial on these 10 counts in July 2023. On May 25, 2022, defendant was pulled over by Niehaus for driving 109 miles per hour in a 70-mile-per-hour zone on Interstate 55. The following facts are taken from the evidence introduced at trial, which included testimony from Niehaus and video from his dashboard camera.

¶ 7        Defendant informed Niehaus that he did not have a driver's license. Because of defendant's honesty, Niehaus told him that, if he had no outstanding warrants, Niehaus would issue citations for his traffic violations and not take him into custody, although defendant would not be allowed to drive away from the scene of the stop because he did not have a driver's license. Niehaus informed defendant that a tow truck would be called to remove his vehicle and that defendant could ride with the tow truck driver and call someone to pick him up. The two waited in their cars for the tow truck to arrive.

¶ 8        More than an hour later, defendant waved Niehaus toward the driver's side of his car and requested permission to go to the bathroom. After defendant finished urinating on the shoulder of the road, he waved for Niehaus again. The two began talking by defendant's car. Defendant suddenly tackled Niehaus to the ground, landing on top of Niehaus with his hand on Niehaus's handgun. Defendant was unable to take the gun, which was secured in its holster by a three-stage locking mechanism, but he was able to take a canister of oleoresin capsicum spray ("pepper spray" or "OC spray") from Niehaus's belt, which he then sprayed in Niehaus's face.

¶ 9        As the two continued to struggle, the tow truck pulled in front of defendant's vehicle, and the driver got out. A bystander, armed with a handgun, approached defendant and Niehaus from behind the squad car and told defendant to get off of Niehaus. Defendant let go of Niehaus and ran into the road, where a car swerved to avoid hitting him. Defendant entered the tow truck through the driver's side door. While defendant was seated in the driver's seat, Niehaus used his Taser on him. Niehaus then pulled defendant out of the tow truck, forced him onto the ground, and arrested him. A toxicology report detected cannabinoids and phencyclidine (PCP) in defendant's urine sample.

¶ 10        On direct examination by the State, Niehaus testified that "OC Spray *** is a less than lethal weapon, you know, utilized to temporarily blind and cause pain. You know, to help to control an arrest, apprehend people that are, you know, actively resistive and uncooperative."

¶ 11        At the close of the State's evidence, defendant moved for a directed finding of not guilty on count I, arguing that the pepper spray was not a "weapon" for purposes of the offense of disarming a peace officer. As we explain further below, the disputed question in the trial court was whether Niehaus's pepper spray was designed solely for personal defense. The trial court denied defendant's motion, explaining that "this OC Spray [wa]s not being used for defensive purposes whatsoever. It [wa]s being used as a weapon, and clearly so, based on this evidence."

¶ 12        The trial court convicted defendant on all 10 counts.

¶ 13                                C. Sentencing

¶ 14        Defendant's presentence investigation report (PSI) showed an extensive criminal record; he was in and out of prison between 2003 and 2020 on offenses involving controlled substances, robbery, and a stolen vehicle. In June 2021, defendant was involuntarily committed for mental health treatment, which the PSI details as follows:

"[Defendant] was transported by Chicago Police Department to Loretto Hospital with complaints of 'schizophrenia, unspecified; polysubstance abuse,' specifically, PCP. Records indicate 'per patient's family patient's behavior had worsened over the last couple weeks. Patient has been talking/responding to himself and behaving in a bizarre manner. Patient destroyed his sister's home, cutting the couch open, breaking windows, and glass tables as nieces/nephews watched in fear. Patient's sister convinced patient to come out of the house to protect her children as she called police. Once the police arrived patient attempted to stab them to the point that they pulled out their taser gun. Patient's sister pleaded with the police as they explained that patient had mental issues.' [Defendant] was handcuffed and brought to the hospital. 'Patient's family no longer feels safe due to patient's unpredictable and violent behavior. Patient's aggression continues to worsen as he does street drugs and refuses to take psych meds. Per patient's sister patient was offered psych meds while incarcerated but continues to refuse.' *** Records note, 'Patient was intoxicated likely with PCP however even at his baseline it sounds like he is having issues with the ability to care for himself and possibly some underlying psychiatric issues which may be compounding this issue as it is not purely isolated to when he abuses drugs.' "

Defendant was discharged after "his behavior began to improve and stabilize" when he was taking an antipsychotic and a bipolar therapy agent.

¶ 15       In his March 2023 presentencing interview, defendant stated that he had been previously diagnosed with post-traumatic stress disorder and bipolar disorder. He took medication but discontinued it because he "didn't like the side effects." According to the PSI,

"[Defendant] stated, 'I heard a lot of weird stuff' in the two (2) weeks leading up to his arrest. [Defendant] could not specify what he was hearing, but reported, 'I wasn't sleeping, my body changed, and I was trying to cover it up with PCP. I was hearing different voices and seeing things. I had never experienced it before.' The defendant advised 'I was high off PCP. That's what happened on the highway.' [Defendant] continued 'It's like I wasn't there until he hit me with the taser.' [Defendant] then stated, 'who in their right mind would hear I'm letting you go, and do that.' [Defendant] stated, 'I'm hurt by what I saw myself do. That's not me. But, I played a part ... I put those substances in my body.' [Defendant] continued, 'I really believe the devil wanted me dead. I'm thankful that he used only the taser. I could have lost my life or he could have lost his, but God softened up our hearts that day. I think about this every[ ]day ... that could have been the end of me. I need help.' "

¶ 16    While he was incarcerated before trial, defendant's compliance with medication was inconsistent, and his medications were eventually discontinued. However, defendant reported to a medical provider:

"I have not been taking no medicine [because of] the way it had me feel. I have been feeling well better than it had me with the medicine. When I take the med, I have [shortness of breath], headaches ... I've been off all medicine. I have been perfect. No attitude. No panic."

Defendant also "participate[d] in counseling 'now and then as needed.' "

¶ 17    At the sentencing hearing, the State elicited testimony from Niehaus regarding his injuries from the traffic stop:

"A. I had sustained a compression fracture of my tenth vertebra in my back.

Q. Can you describe what you experienced as far as the symptoms, the pain and like on that fracture?

A. When I was taken to the ground and hit the ground, I felt an extremely sharp pain in my back. It radiated throughout my body at the time. After I was able to handcuff [defendant], at that point, my back started locking up and to the point where I couldn't stand up at that time and continued to be extremely painful.

Q. And what type of treatment did you receive for that injury?

A. I was taken to the St. James Hospital via ambulance, received medication for that. They did all appropriate tests and scans and advised that's what the injury was. So, basically, pain medication and physical therapy is what was needed for that injury.

Q. And how long did you go through physical therapy for that injury?

A. I was off work essentially for seven weeks, and then eight weeks of physical therapy after that.

Q. And at this point, do you still suffer from any lasting [e]ffect from that?

A. I still have pain in that area, just aching. I'm able to fully function, but I still have discomfort in my back.

Q. And have you otherwise been able to return fully doing your duties?

A. Back to full duty at this time."

¶ 18    Defendant introduced a forensic psychiatric evaluation by Terry M. Killian, M.D., who had interviewed defendant before trial. Dr. Killian opined,

"It is clear that there is a significant amount of mitigation evidence for [defendant], including his very traumatic childhood which he attempts to manage by using PCP and cannabis extensively. In addition, he probably does have some kind of a chronic psychotic disorder for which he was not being treated at the time of the assault against Trooper Niehaus."

¶ 19     During his statement in allocution, defendant said,

"I apologize to the state trooper. I never meant no harm. Never. I wasn't in right state of mind. Something came upon me. I can't even explain. I can't explain what came upon me, but it was all about get away. David pray that all type of thing came upon me. It was the spirit of the Most High. I ain't have control like I have control now, but I never meant to hurt no one. Never. I'm not a violent man. Yes, I been since I was 13 years old smoked PCP and a habit at age of 13 years old. All my convictions because of me chasing to get high of PCP. I never hurt no one. I always sold drugs. Yes, I did rob. I stole. I did all that just to support my habit, because I was addicted to PCP. It made me feel something different. It made me feel like I wasn't a part of this world. Make me feel I could fly, give free in a different form of human being form. And I liked that, and I liked that high. But it also been my downfall."

¶ 20     The trial court stated its intention to take "a five-minute recess" to read Dr. Killian's six-page report, further stating that it would be "back in five to ten minutes." The record does not reflect the actual length of the recess. After returning to the bench, the court explained its sentencing decision, and it specifically addressed defendant's substance abuse and mental illness as follows:

"He has a long and involved drug addiction with not a whole lot of intensive or indication that he wants to change that. He's said it here in the courtroom that he likes the feeling of PCP. It makes him feel free, makes him feel like he can fly. [Defendant], I would suggest to you that if you can fly, it's not feeling real. He does suffer from some possible mental health issues. His time in the county jail, while more recently he has cooperated and been cooperative in the county jail, when he was arrested and taken to the jail on May 26th, he tore up his mattress. And in October he was acting aggressive to jail staff indicating that you are expletive snakes. You are all expletive snakes. And he was aggressive toward jail staff."

¶ 21        The trial court sentenced defendant to 30 years' imprisonment on count I for taking Niehaus's pepper spray, 7 years on count II for attempting to take Niehaus's firearm, and 7 years on count III for striking Niehaus. Defendant's sentences on counts I through III were consecutive to one another and concurrent with his sentences on the remaining seven counts, for an aggregate sentence of 44 years' imprisonment. The court granted defendant's motion to reconsider his sentence in part by vacating his sentence on one of those seven counts but denied the motion in all other respects, leaving his 44-year aggregate sentence in place.

¶ 22        This appeal followed.

¶ 23                                II. ANALYSIS

¶ 24                         A. Pepper Spray as a Weapon

¶ 25        Defendant's first argument revolves around the meaning of the term "weapon" in section 31-1a of the Criminal Code of 2012 (Code), which provides:

    "A person who, without the consent of a peace officer or correctional institution employee as defined in subsection (b) of Section 31-1, takes a weapon from a

person known to him or her to be a peace officer or correctional institution employee, while the peace officer or correctional institution employee is engaged in the performance of his or her official duties or from an area within the peace officer's or correctional institution employee's immediate presence is guilty of a Class 1 felony." *Id.* § 31-1a(a).

The proper interpretation of this statute is a question of law that we review *de novo*. *People v. Howard*, 2017 IL 120443, ¶ 19.

¶ 26                                     1. *The Plain Meaning of "Weapon"*

¶ 27            "The fundamental rule of statutory construction is to ascertain and give effect to the legislature's intent. The most reliable indicator of legislative intent is the language of the statute, given its plain and ordinary meaning." *Id.* The legislature added the word "weapon" to section 31-1a in 2003 (see Pub. Act 93-207, § 5 (eff. Jan. 1, 2004)); before that time, the statute only prohibited "taking a firearm" from a peace officer (720 ILCS 5/31-1a (West 2002)). This "statutory amendment creates a presumption that it was intended to change existing law" (*People v. Stewart*, 2022 IL 126116, ¶ 20), although the parties agree that no Illinois case has resolved the question of what weapons other than firearms are now covered by section 31-1a (but see *People v. Dorsey*, 2016 IL App (4th) 140734, ¶¶ 3, 13 (mentioning that defendant had pleaded guilty to "disarming a peace officer by taking [the officer's] Taser" on a count not challenged in the appeal)). However, this court has held that under the current version of section 31-1a, as under the prior version, " 'the obvious intent of the legislature was to prevent the disarming of police officers and the seizing of weapons by dangerous citizens.' " *People v. Kirchner*, 2012 IL App (2d) 110255, ¶ 14 (quoting *People v. Gay*, 239 Ill. App. 3d 1023, 1025 (1993)).

¶ 28     The word "weapon" had the same meaning in 2003 as it does today: "[a]n instrument of attack or defense in combat." The American Heritage Dictionary 921 (4th ed. 2001). "Weapon" is ambiguous to the extent that it can apply not just to objects *designed* to be used as instruments of attack or defense in combat but also to objects that are merely *susceptible* to being used as instruments of attack or defense in combat, categories that can be roughly described as "intrinsic weapons" and "improvised weapons." See Black's Law Dictionary 1587 (7th ed. 1999) (defining "weapon" as "[a]n instrument *used* or *designed to be used* to injure or kill someone" (emphases added)); *cf. People v. Skelton*, 83 Ill. 2d 58, 65 (1980) ("An object not deadly *per se* may still be a dangerous weapon because of its capacity to inflict serious harm even though not designed for that purpose, as in the case of a baseball bat."). Defendant argues against a definition of "weapon" in section 31-1a that includes improvised weapons because "th[is] overly broad definition would erroneously include instruments such as pencils, police radios, and the like."

¶ 29     We need not opine whether, or to what extent, section 31-1a could apply to improvised weapons as well as intrinsic weapons because this case involves an intrinsic weapon. See *Goral v. Dart*, 2020 IL 125085, ¶ 76 ("Courts of review will not decide *** abstract questions, will not review cases merely to establish precedent, and will not render advisory opinions."). Unlike a pencil or a police radio, pepper spray is not designed for some other benign use; indeed, we are unaware of any use for pepper spray other than "to temporarily blind and cause pain" to a person, as Niehaus testified. Defendant's efforts to characterize pepper spray as a "less-than-lethal device" "containing a natural substance" "incapable of inflicting serious injury or death" are unavailing; pepper spray's intended function is to injure or temporarily disable another person; therefore it is an intrinsic weapon. *Cf. People v. Greene*, 96 Ill. 2d 334, 338 (1983) (finding that "a tear gas device which is merely foul smelling or irritating" was distinct from explosive devices

but could constitute a weapon under section 24-1(a)(3) of the Code (720 ILCS 5/24-1(a)(3) (West 2022); Ill. Rev. Stat. 1979, ch. 38, ¶ 24-1(a)(3))); *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1245 (11th Cir. 2003) (*per curiam*) (describing pepper spray as a "nonlethal weapon").

¶ 30        Defendant's attempt to square his interpretation with the legislature's intent falls flat. See *Standard Mutual Insurance Co. v. Lay*, 2013 IL 114617, ¶ 26 ("[I]n construing a statute," "[t]he court may consider the reason for the law, the problems sought to be remedied, and the purposes to be achieved."). As a matter of common sense, a statute intended to prevent the disarming of peace officers should, at a minimum, apply to those intrinsic weapons ordinarily carried by peace officers, such as pepper spray, which peace officers are expressly allowed to carry without violating the statute prohibiting the unlawful use of weapons. See 720 ILCS 5/24-1(a)(3), 24-2(a)(1) (West 2022). Defendant suggests that it is illogical to treat pepper spray like other weapons carried by peace officers, such as firearms, Tasers, and stun guns, because pepper spray is carried for defensive purposes.

¶ 31        Putting aside defendant's premise that Tasers and stun guns are *not* primarily defensive weapons, in our view this entire aspect of defendant's argument is a red herring. The statute prohibits the disarming of a peace officer; it says nothing about the offensive versus defensive nature of the weapon taken from the peace officer. Furthermore, any weapon—be it a firearm or pepper spray—can be used for both offensive and defensive purposes, because the weapon acts in the same manner regardless of whether it is being employed offensively or defensively. Even a weapon such as pepper spray, though commonly used defensively, can also be used offensively—as defendant here demonstrated by using it against Niehaus. Applying its plain and ordinary meaning, we find that the word "weapon," as used in section 31-1a, extends to the kind of pepper spray used here.

¶ 32                    2. *Definitions from Other Sections of the Code*

¶ 33          Defendant argues that, even if the plain meaning of the word "weapon" includes pepper spray, we should not adopt this "entirely new definition" for weapon in section 31-1a; rather, we should employ a definition drawn from sections 24-1(a)(3) and 31A-0.1 (*id.* §§ 24-1(a)(3), 31A-0.1). In doing so, defendant is arguing that we should engraft on section 31-1a a definition that the legislature did not include there.

¶ 34          It is certainly true that definitions from some sections of the Code may be made *explicitly* applicable to other sections. For example, the provision at issue here—section 31-1a—uses the term "peace officer" without defining it. However, article 2 of the Code sets forth general definitions that are to be applied throughout the Code, and one of those definitions explains the meaning of the term "peace officer." *Id.* §§ 2-0.5, 2-13. This is not the case with respect to the word "weapon," as there is no definition of that word made explicitly applicable to article 31.

¶ 35          Indeed, it is this distinction that renders unhelpful the case chiefly relied on by defendant, *People v. Runge*, 346 Ill. App. 3d 500, 506 (2004) (citing 720 ILCS 5/31A-1.1(c)(2)(v) (West 2000)). In *Runge*, the court was called upon to address what constitutes prohibited contraband in a penal institution. The definitions given in section 31A-1.1 are now codified under section 31A-0.1 (720 ILCS 5/31A-0.1 (West 2022)), which was added in 2013. *Runge* looked to the weapons identified in section 24-1(a)(3) of the Code dealing with the unlawful use of weapons. However, the *Runge* court was following the dictates of the statute because section 31A-1.1 specifically *incorporated* the weapons mentioned in section 24-1(a)(3) as items of contraband. 720 ILCS 5/31A-1.1(c)(2)(v) (West 2000)). Consequently, *Runge* decided that a cannister of pepper spray was not contraband under section 31A-1.1 because it was expressly excluded from section 24-1(a)(3), as incorporated by reference. *Runge*, 346 Ill. App. 3d at 507.

¶ 36 Furthermore, the definitions of contraband items under section 31A-1.1 examined in *Runge* are expressly *not* applicable to section 31-1a, because the definition of contraband, including weapons, in the current section 31A-0.1 is *explicitly* set forth as being "[f]or the purposes of" article 31A. 720 ILCS 5/31A-0.1 (West 2022). A definition explicitly limited to article 31A does not explicitly extend to article 31, where section 31-1a is located. See *People v. Ligon*, 2016 IL 118023, ¶¶ 22-25 (explaining that a narrow definition of " 'armed with a dangerous weapon for purposes of this Article [(33A)]' " did not affect the broader definition of "dangerous weapon" for offenses under other articles (quoting 720 ILCS 5/33A-1(c) (West 2000))).

¶ 37 As for section 24-1(a)(3), the Code does not explicitly provide this section should supply the definition of "weapon" for section 31-1a. Furthermore, section 31-1a lacks any express language incorporating section 24-1(a)(3) by reference. On the other hand, the Code expressly provides that section 24-1(a)(3) "do[es] not apply to or affect *** [p]eace officers" (720 ILCS 5/24-2(a)(1) (West 2022)), which further attenuates any supposed connection between the two.

¶ 38 This lack of an explicit connection is significant because the legislature has the "ability to use general and intentionally broad language when referring to weapons" in some sections of the Code, notwithstanding more specific language in other sections. *People v. Gazelle*, 230 Ill. App. 3d 115, 120 (1992). The legislature may even ascribe different, contradictory meanings to the same term. See *People v. Dressler*, 317 Ill. App. 3d 379, 386 (2000) (finding that pepper spray was not a "dangerous weapon" under the aggravated kidnapping statute, even though it could be a "dangerous weapon" under the armed robbery statute). If the legislature's use of general terms like "weapon" in the Code were sufficient to invoke section 24-1 by implication, then there would have been no need for section 31A-0.1 to explicitly incorporate section 24-1 by

reference. See *Van Dyke v. White*, 2019 IL 121452, ¶ 46 ("No part of a statute should be rendered meaningless or superfluous."). As such, the absence of a similar reference in section 31-1a implies that section 24-1 is *not* intended to supply the definition of "weapon" for section 31-1a. See *People v. Goossens*, 2015 IL 118347, ¶ 12 ("It is well settled that when the legislature uses certain language in one instance of a statute and different language in another part, we assume different meanings were intended.").

¶ 39       By way of comparison, this court has held that, when "the term 'dangerous weapon' [is] used without any accompanying specifics that might limit the scope of that term," it is entitled to a *broad* interpretation by default. *Gazelle*, 230 Ill. App. 3d at 121; see *Ligon*, 2016 IL 118023, ¶ 21 (defining "dangerous weapon" as "any object sufficiently susceptible to use in a manner likely to cause serious injury"); see also *People v. Conick*, 232 Ill. 2d 132, 138 (2008) ("[Courts] *** afford the statutory language the fullest, rather than narrowest, possible meaning to which it is susceptible."). We declined to afford this broad interpretation to the term "dangerous weapon" in the predecessor to section 31A-0.1 precisely because it incorporated section 24-1 by reference, indicating a narrower definition. See *Gazelle*, 230 Ill. App. 3d at 120-21.

¶ 40       On several occasions, this court has upheld factual findings that pepper spray constituted a dangerous weapon under the default interpretation of that term. See *People v. Johnson*, 2018 IL App (1st) 153634, ¶¶ 14-15; *People v. Lampton*, 385 Ill. App. 3d 507, 515 (2008); *People v. Elliott*, 299 Ill. App. 3d 766, 773 (1998). This suggests that, if the legislature had used the term "dangerous weapon" in section 31-1a rather than "weapon," we would have reached the same conclusion here. We are skeptical of any interpretation of the Code resulting in the absurd contradiction that pepper spray can simultaneously be a "dangerous weapon" but not a mere "weapon." See *Evans v. Cook County State's Attorney*, 2021 IL 125513, ¶ 27 ("Statutes must be

construed to avoid absurd or unjust results."). But see *Dressler*, 317 Ill. App. 3d at 386 (finding pepper spray could be a "dangerous weapon" under one section but not a "dangerous weapon" under another section).

¶ 41                                    3. *In Pari Materia*

¶ 42            Despite the fact that there is clearly no explicit connection between section 31-1a and sections 24-1(a)(3) and 31A-0.1, defendant argues that there is, in effect, an implicit one. He invokes "the maxim of *in pari materia*, under which [multiple] statutes, or [multiple] parts of one statute, concerning the same subject must be considered together in order to produce a 'harmonious whole.' " *People v. Rinehart*, 2012 IL 111719, ¶ 26 (quoting *Sulser v. Country Mutual Insurance Co.*, 147 Ill. 2d 548, 555 (1992)). It is true that, "whenever a legislative body enacts a provision, it has in mind previous statutes relating to the same subject matter such that they should all be construed together." *People v. Burge*, 2021 IL 125642, ¶ 31. The doctrine applies not only to separate statutes but also to different sections of the same statute, and it is "consistent with the fundamental rule of statutory interpretation that all the provisions of a statute must be viewed as a whole." *People v. McCarty*, 223 Ill. 2d 109, 133 (2006). For this reason, "the entire [Code] and each of its sections must be considered" when we determine the meaning of a term not specifically defined in the Code. See *People v. Frieberg*, 147 Ill. 2d 326, 346-47 (1992) (interpreting the term "purpose").

¶ 43            However, the maxim of *in pari materia* operates on the presumption that the relevant sections are "governed by one spirit and a single policy." *Uldrych v. VHS of Illinois, Inc.*, 239 Ill. 2d 532, 540 (2011). If the legislature clearly intended for the sections to serve different purposes, target different problems, and achieve different goals, then the maxim of *in pari materia* must give way to the legislature's intent. See *Abruzzo v. City of Park Ridge*, 231 Ill. 2d 324, 332

(2008); see also *Gazelle*, 230 Ill. App. 3d at 120 ("[T]he Code provides convincing evidence that the legislature can make its intent perfectly clear regarding how generally or how specifically it wishes to categorize weapons.").

¶ 44   Given that, when it enacted section 31-1a, " 'the obvious intent of the legislature was to prevent the disarming of police officers and the seizing of weapons by dangerous citizens,' " we will consider whether the intent underlying sections 24-1(a)(3) and 31A-0.1 suggests that they should be read *in pari materia* with section 31-1a. *Kirchner*, 2012 IL App (2d) 110255, ¶ 14 (quoting *Gay*, 239 Ill. App. 3d at 1025).

¶ 45                           a. Section 24-1(a)(3)

¶ 46   Defendant primarily relies on section 24-1(a)(3) of the Code, which provides,

"A person commits the offense of unlawful use of weapons when he knowingly[ ]

* * *

*** [c]arries on or about his person or in any vehicle, a tear gas gun projector or bomb or any object containing noxious liquid gas or substance, other than an object containing a non-lethal noxious liquid gas or substance designed solely for personal defense carried by a person 18 years of age or older[.]" 720 ILCS 5/24-1(a)(3) (West 2022).

¶ 47   In defendant's estimation, section 24-1(a)(3), which on its face governs only the unlawful *carrying* of weapons, also serves to *define* the term "weapon" as excluding "an object containing a non-lethal noxious liquid gas or substance designed solely for personal defense." *Id.* We are not convinced. Under defendant's reading of section 24-1(a)(3), the same pepper spray legally carried by an 18-year-old would transmute into a prohibited "weapon" in the hands of a 17-year-old. While this is a common exercise in line-drawing when it comes to criminal culpability

depending on age, it demonstrates that the underlying *nature* of the weapon remains the same whether it is being carried legally or illegally. By way of comparison, section 24-1(a)(4) provides that a person does not commit the offense of unlawful use of weapons when he carries a firearm concealed on his person in his own abode, even though a firearm carried in those circumstances undoubtedly remains a weapon. See *Id.* § 24-1(a)(4).

¶ 48　　　　Accordingly, the better reading of section 24-1(a)(3) is that pepper spray *is* a weapon but that an adult's carrying of it is a *lawful* use of weapons not prohibited by section 24-1(a)(3). Under this reading, pepper spray can be a weapon under both sections 24-1(a)(3) and 31-1a, rendering them in perfect harmony.

¶ 49　　　　Even if we were to accept defendant's reading, however, it fails to acknowledge that the statutes present two entirely different questions: section 24-1(a)(3) deals with the *carrying* of weapons, whereas section 31-1a deals with the *taking* of weapons from peace officers without their consent. This difference is significant; the fact that it is legal to carry a wallet does not make it any more legal to take another person's wallet without that person's consent. The legislature could understandably have decided that an item could be safely carried by private citizens without exempting from punishment the act of wresting that very same item from the possession of a peace officer. This principle is true even of handguns, which nondangerous citizens may carry and which section 31-1a undoubtedly covers. See 430 ILCS 66/25 (West 2022) (prescribing the qualifications for a person to carry a concealed-carry license).

¶ 50　　　　Because employing the maxim of *in pari materia* the way defendant invites us to do would be inconsistent with the legislative intent underlying these sections, we decline the invitation. See *Abruzzo*, 231 Ill. 2d at 332.

¶ 51　　　　　　　　　　　b. Section 31A-0.1

¶ 52    Defendant also relies on the following definition contained in the article of the Code

governing interference with penal institutions:

"For the purposes of this Article [(31A)]:

* * *

'Item of contraband' means any of the following:

* * *

*** 'Weapon' means any knife, dagger, dirk, billy, razor, stiletto,

broken bottle, or other piece of glass which could be used as a dangerous

weapon. This term includes any of the devices or implements designated in

subsections (a)(1), (a)(3) and (a)(6) of Section 24-1 of this Code, or any

other dangerous weapon or instrument of like character." 720 ILCS 5/31A-

0.1 (West 2022).

Unlike section 24-1(a)(3), section 31A-0.1 does expressly define the term "weapon." As noted

above, however, the definition is explicitly limited to article 31A of the Code, so its applicability

to article 31 is questionable at best. *Cf. Dressler*, 317 Ill. App. 3d at 386 (finding that pepper spray

was not a "dangerous weapon" under article 33A, even though it could still be a "dangerous

weapon" under article 18). In *Gazelle*, 230 Ill. App. 3d at 121, we refused to judicially rewrite the

narrow definition now contained in section 31A-0.1 in favor of the broader definition found

elsewhere in the Code; judicial rewriting to accomplish the opposite result is equally improper.

¶ 53    Indeed, we specifically explained:

"If the legislature were to decide that a broader interpretation of the word 'weapon'

is needed or desirable than the interpretation given to that word in this opinion, the

legislature could amend section [31A-0.1] of the Code to make more general that

- 18 -

statute's reference to weapons, as is the case with the armed robbery, aggravated criminal sexual assault, aggravated battery, and aggravated unlawful restraint statutes mentioned earlier." *Id.*

We presume that the legislature's subsequent amendment to section 31-1a was made with knowledge of *Gazelle*'s interpretation of section 31A-0.1 (see *Bruso v. Alexian Brothers Hospital*, 178 Ill. 2d 445, 458 (1997)), so the legislature's choice to use a more general reference to weapons in section 31-1a presumably reflects an intent for a broader interpretation to be given to that section than was given to section 31A-0.1 in *Gazelle*. See *Goossens*, 2015 IL 118347, ¶ 12 (noting that the omission of language leads to an assumption that a different meaning is intended).

¶ 54        In light of these indicators of the legislature's intent to the contrary, we conclude that the maxim of *in pari materia* does not warrant extending the definition of "weapon" in section 31A-0.1 to replace the plain and ordinary meaning of "weapon" in section 31-1a, which includes pepper spray. See *Abruzzo*, 231 Ill. 2d at 332. For this reason, defendant cannot rely on *Runge*'s conclusion that possession of pepper spray could not support a conviction for possession of contraband in a penal institution. Because defendant has failed to establish legal error, we uphold his conviction for disarming a peace officer.

¶ 55                    B. The Length of Defendant's Sentence

¶ 56        Defendant argues that his aggregate sentence of 44 years' imprisonment is excessive; defendant especially takes issue with his 30-year sentence on count I for taking Niehaus's pepper spray, consecutive to his 14-year sentence on counts II and III. Defendant points out that 30 years is the maximum extended-term sentence for this offense and that "consecutive sentences are rarely appropriate and *** must be imposed sparingly." *People v. Wrice*, 140 Ill. App. 3d 494, 500-01 (1986). Of course, "rarely" does not mean "never" (see *id.* (upholding the

imposition of consecutive sentences)), and even the maximum aggregate sentence authorized by the legislature carries with it a presumption of validity and will only be reversed when the trial court abused its discretion (*People v. Musgrave*, 2019 IL App (4th) 170106, ¶ 56). We will find a sentence excessive only when it is manifestly disproportionate to the nature of the offense or greatly at variance with the spirit and purpose of the law. *People v. Fern*, 189 Ill. 2d 48, 54 (1999). As noted above, the purpose of this particular law is " 'to prevent the disarming of police officers and the seizing of weapons by dangerous citizens.' " *Kirchner*, 2012 IL App (2d) 110255, ¶ 14 (quoting *Gay*, 239 Ill. App. 3d at 1025).

¶ 57        "The trial court's sentence must be based upon the particular circumstances of the case, including (1) the defendant's history, character, and rehabilitative potential; (2) the seriousness of the offense; (3) the need to protect society; and (4) the need for punishment and deterrence." (Internal quotation marks omitted.) *People v. Klein*, 2022 IL App (4th) 200599, ¶ 34; see Ill. Const. 1970, art. I, § 11 ("All penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship."). We will not substitute our judgment for the trial court's merely because we might have weighed these factors differently. *Klein*, 2022 IL App (4th) 200599, ¶ 37.

¶ 58        Although we have often pointed out that "the most important sentencing factor is the seriousness of the offense" (*People v. Aquisto*, 2022 IL App (4th) 200081, ¶ 112), defendant largely disregards this factor, and when he does acknowledge it, he focuses on the lack of severe, lasting consequences for those involved. Divorced from context, defendant's crime of taking a canister of pepper spray from a peace officer may not sound so serious, but as the trial court recognized, the facts of this case are egregious. See *id.* ("The word 'offense,' in the phrase the 'seriousness of the offense,' means not the statutory offense in the abstract but the offense as

- 20 -

committed by the defendant: the particular facts and circumstances of the defendant's offense."); see also *Fern*, 189 Ill. 2d at 56 ("The propriety of the sentence imposed in a particular case cannot properly be judged by the sentence imposed in another, unrelated case.").

¶ 59　　　　After wresting the pepper spray from Niehaus and using it against him, defendant might have pressed his attack further, and with greater injury, had a bystander not happened to intervene; the fact that the injuries defendant inflicted on Niehaus were temporarily rather than permanently disabling was also a matter of chance. Defendant himself could have been killed if Niehaus or the bystander had failed to exercise the self-control that defendant lacked, or if other drivers on the road had been traveling at 39 miles per hour over the speed limit, as defendant had, they might have hit and killed him when he ran into the road. The trial court could reasonably conclude from these facts that the offense as committed by defendant was extremely serious and that its seriousness was not mitigated by the absence of severe, lasting consequences for those involved, which was attributable not to defendant but to forces beyond his control.

¶ 60　　　　Furthermore, the seriousness of the offense is not the only factor. The trial court's concern about the need to protect society was reasonable, given that defendant escalated a cordial, routine traffic stop into a life-and-death struggle. If defendant nearly murdered a peace officer who helped him, he could react even more violently when confronted by an officer in a higher-pressure situation, or he could successfully obtain the officer's firearm rather than just a canister of pepper spray. Similarly, the court reasonably addressed the need for punishment and deterrence given that "[t]his offense occurred in similar fashion to [defendant's] other offenses" and that the significantly lower sentences defendant had received for those other offenses had been insufficient to deter him from reoffending.

¶ 61    In his brief, defendant downplays these factors and focuses on his history, character, and rehabilitative potential and, in particular, his struggles with mental illness and addiction. See 730 ILCS 5/5-5-3.1(a)(16) (West 2022) (establishing the mitigating factor that "[a]t the time of the offense, the defendant was suffering from a serious mental illness which *** substantially affected his or her ability to understand the nature of his or her acts or to conform his or her conduct to the requirements of the law"). This court has emphasized on many occasions that "the 'existence of mitigating factors does not require the trial court to reduce a sentence from the maximum allowed.' " *People v. Halerewicz*, 2013 IL App (4th) 120388, ¶ 42 (quoting *People v. Pippen*, 324 Ill. App. 3d 649, 652 (2001)). Moreover, we are not convinced that these factors are entitled to the mitigating weight defendant believes they were. See *People v. Sturgeon*, 2019 IL App (4th) 170035, ¶ 104 ("The weight to be given to any proper factor *** is left to the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion." (Emphasis omitted.)).

¶ 62    On the issue of mental illness, defendant speculates that the trial court cannot have read Dr. Killian's report during a five-minute recess. Initially, we note that the record does not show that the recess was five minutes long; the court stated the intention to return in "five to ten minutes," and the record does not give a measure of the time actually taken. We see no basis to speculate that the trial court lacked ample time to read and digest the six-page report.

¶ 63    Defendant also takes issue with the trial court's statement that defendant "does suffer from some possible mental health issues," but the court was essentially restating what Dr. Killian said in his report: "It appears from the records I reviewed and our interview that [defendant] probably does have some type of illness such as schizoaffective disorder." The mere fact that the court used the word "possible" rather than "probabl[e]" does not mean the court failed to consider

Dr. Killian's report or the other evidence suggesting that defendant suffered from a mental illness. See *People v. Dowding*, 388 Ill. App. 3d 936, 943 (2009) ("In determining whether the trial court based the sentence on proper aggravating and mitigating factors, a court of review should consider the record as a whole, rather than focusing on a few words or statements by the trial court."). Having considered this evidence, the court was entitled to assign it little or no mitigating weight. *People v. Powell*, 2013 IL App (1st) 111654, ¶ 35 ("While the trial court cannot *ignore* evidence in mitigation, it may determine the weight to attribute to mitigating evidence." (Emphasis added.)).

¶ 64 Defendant argues that the trial court improperly used his mental illness as an aggravating factor, but the court's concern was not his mental illness *per se* but his repeated use of PCP, which he claimed was a form of self-medication for his mental health problems. Although defendant suggests that his addiction to PCP made him less culpable, addiction is not a statutory mitigating factor (see 730 ILCS 5/5-5-3.1 (West 2022)), so the court "was under no legal obligation to subscribe to this suggestion" (*People v. Shatner*, 174 Ill. 2d 133, 160 (1996)). "Instead, a history of substance abuse is a 'double-edged sword' that the trial court may view as a mitigating or aggravating factor." *Sturgeon*, 2019 IL App (4th) 170035, ¶ 105 (quoting *People v. Mertz*, 218 Ill. 2d 1, 83 (2005)).

¶ 65 To the extent the trial court exercised its discretion to view defendant's history of substance abuse as an aggravating factor, we find no abuse of discretion. To be sure, defendant expressed remorse for his past criminal activity, which he said was a result of chasing the high of PCP. But every time defendant was released from incarceration or inpatient treatment, he invariably chose self-medication with PCP rather than prescription medication or counseling, despite knowing that when he did, he lost control, committed crimes, and even made his family fear for their safety in their own home. Accordingly, "the court could have properly concluded that

defendant's drug addiction lessened his rehabilitative potential, increased the seriousness of the offense, increased the need to protect society, and increased the need for deterrence." *Id.* ¶ 108.

¶ 66 On these facts, we cannot conclude that defendant's 30-year sentence for disarming a peace officer, or his aggregate 44-year sentence, is manifestly disproportionate to the seriousness of the offense or greatly at variance with the spirit and purpose of the law.

¶ 67 III. CONCLUSION

¶ 68 For the reasons stated, we affirm the trial court's judgment.

¶ 69 Affirmed.

*People v. Turner*, 2024 IL App (4th) 230641

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of McLean County, No. 22-CF-530; the Hon. William A. Yoder, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Amy G. O'Toole, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Erika Reynolds, State's Attorney, of Bloomington (Patrick Delfino, Edward R. Psenicka, and Katrina M. Kuhn, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |