NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 241163-U

NO. 4-24-1163

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
November 17, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
|     Plaintiff-Appellee, | ) | Circuit Court of |
|     v. | ) | Winnebago County |
| JORDAN D. SPATES, | ) | No. 17CF2436 |
|     Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Brendan A. Maher, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE HARRIS delivered the judgment of the court.
Justices Zenoff and Lannerd concurred in the judgment.

**ORDER**

¶ 1    *Held*: (1) The State presented sufficient evidence to prove defendant guilty of the charged offenses beyond a reasonable doubt.

(2) The trial court committed no error in denying defendant's motion to suppress eyewitness identification evidence.

(3) Defendant failed to establish that the trial court committed reversible error in limiting the scope of his expert witness's testimony.

(4) Defendant failed to establish that his trial counsel was ineffective in presenting expert eyewitness identification testimony.

(5) The trial court's sentencing decision was not an abuse of discretion.

¶ 2    Following a jury trial, defendant, Jordan D. Spates, was found guilty of attempted first degree murder (720 ILCS 5/8-4(a), 9-1(a)(1) (West 2016)) and aggravated battery (*id.* § 12-3.05(e)(2)) and sentenced to 75 years in prison. He appeals, arguing (1) the State failed to prove his guilt beyond a reasonable doubt, (2) the trial court erred by denying his motion to

suppress eyewitness identification evidence, (3) the court erred by limiting the testimony of his expert witness, (4) his trial counsel provided ineffective assistance in presenting the opinions of his expert witness, and (5) his 75-year prison sentence was excessive. We affirm.

¶ 3                              I. BACKGROUND

¶ 4        In October 2017, a grand jury indicted defendant on four counts of attempted first degree murder (*id.* § 8-4(a), 9-1(a)(1), (b)(1) and one count of aggravated battery (*id.* § 12-3.05(e)(2)). The charges were based on allegations that on September 23, 2017, while fleeing from Winnebago County Sheriff's Deputy Stephen Wright after an attempted traffic stop, defendant fired multiple gunshots at Wright, striking him twice.

¶ 5              A. Motion to Suppress Identification Evidence

¶ 6        Prior to trial, defendant filed a motion to suppress evidence that Wright identified him as the shooter. He argued Wright's identification was tainted because law enforcement failed to follow the proper procedures for conducting a photo lineup as set forth in section 107A-2 of the Code of Criminal Procure of 1963 (Lineup Statute) (725 ILCS 5/107A-2 (West 2016)). Defendant complained that, rather than having an "independent administrator" display to Wright a "photographic array" that included other individuals, an investigator in the case showed Wright only photographs of defendant. Defendant asked the trial court to suppress any identification evidence that resulted from "the improper photo line[ ]up," as well as any in-court identification of him, stemming "from the improper pre[ ]trial identification."

¶ 7        The State filed a response to defendant's motion, arguing that the requirements of the Lineup Statute were not applicable given the specific circumstances of the case and characterizing what occurred as a reasonably appropriate "showup procedure." The State further argued that defendant could not meet his burden of establishing that the "showup" was

unnecessarily suggestive and resulted in misidentification.

¶ 8    On April 1, 2019, the trial court conducted a hearing on defendant's motion to suppress. Defendant presented testimony from Ryan Heavin, a detective with the Winnebago County Sheriff's Office, who assisted with the investigation into Deputy Wright's shooting. Heavin testified that after defendant became a potential suspect in the case, he was told to get photographs of defendant to show to Wright. Heavin obtained a photograph of defendant "from the jail mugshot system," while another detective located a photograph of defendant on Facebook. Heavin showed both photographs to Wright while he was in the hospital.

¶ 9    Heavin stated that Wright had been shot around 1:30 a.m. and he showed Wright defendant's photographs around 2:40 p.m. the same day, approximately 13 hours after the shooting. Although Wright was in the hospital and had undergone surgery, Heavin observed that Wright was alert and not impaired at the time of their interaction. He testified that he introduced himself to Wright and informed Wright that he "was there to show him a couple photos." When Heavin held up defendant's photographs, Wright "[i]nstantly *** pointed to the photos" and said, " ['T]hat's the guy who shot me.[']" Heavin acknowledged that the identification procedure he used did not involve obtaining an independent administrator to show the photographs to Wright and he did not "compose any sort of photo array" that included other people.

¶ 10    Following Heavin's testimony, defendant indicated he had no further evidence to present, and the State moved for a directed finding in its favor. The trial court took the matter under advisement and, on April 5, 2019, entered a written order denying the State's motion. The court found defendant's evidence showed that the State failed to comply with the Lineup Statute and further stated as follows:

"That non-compliance with the Lineup Statute on the specific facts thus far

- 3 -

presented at the hearing is *prima facie* evidence that an impermissibly suggestive pre[ ]trial identification procedure was used, such that the defendant has met his burden of production, thereby shifting *** the burden to the State to show that, under totality of [the] circumstances, the compliance with the Lineup Statute was not practical and/or that Deputy Wright's identification of the defendant was sufficiently reliable that it should be admitted at trial notwithstanding the non-compliance."

¶ 11       On April 30, 2019, the trial court conducted a continued hearing on defendant's motion to suppress. The State presented testimony from Deputy Wright, who stated that at the time of the shooting, he was working a 7 p.m. to 7 a.m. shift as a patrol deputy. During his shift, he became aware of a report of a vehicle that fled from another deputy. Wright received information that the vehicle was a gold Buick, along with its license plate number. Shortly after 1 a.m., he observed and began following a gold Buick with the same license plate number. Wright stated that when he first saw the vehicle, he "pulled right behind it" and was "probably a couple car lengths behind." He observed that there was only one person in the vehicle and the individual was a Black male. Wright stated he "checked with dispatch" to confirm that the vehicle he observed was the same one involved in the earlier incident and continued to follow it until other deputies could "get in [his] area."

¶ 12       Eventually, Wright activated his emergency lights to initiate a traffic stop. Although the vehicle began to pull over to the side of the road, it ultimately made a U-turn and drove away in the opposite direction. Wright activated his siren and "initiated pursuit." He continued to pursue the vehicle, which reached speeds of 90 to 100 miles per hour in a 45 miles per hour zone. Wright estimated that the pursuit continued for one and a half to two minutes. Then, as they were traveling

in the eastbound lanes of a four-lane roadway, the suspect vehicle crossed a raised center median and "went into oncoming traffic." Seconds later, the vehicle came to a stop, and a man exited the vehicle and began to run "back west bound" toward Wright. Wright stated he ran in a northerly direction "to cut [the man] off."

¶ 13 Wright testified it was approximately 1:30 in the morning and "dark out." He stated his "emergency lights were lighting up the area" and there was also "lighting" from the other vehicle. Wright estimated that he was around 15 or 20 feet away from the man as he exited the Buick. He described the man as a Black male who was tall and skinny, with short hair. Wright also testified that the man "was about [his] height" and weighed about 150 pounds. Further, he described the man as wearing black pants and a white and black shirt.

¶ 14 While fleeing on foot, the man slipped and fell in a ditch as Wright was about 15 feet away and "getting closer." As the man was getting up, he turned and looked toward Wright, and they made eye contact for a few seconds. Wright stated the area was still illuminated by his squad car's lights and that he observed that the man had short hair and a thin mustache. He also determined that the man was about 26 or 27 years of age. According to Wright, the man got up, and Wright observed the man's hands disappear. A second later, Wright was shot. He estimated he was 5 to 10 feet away from the man when the shooting occurred and stated that, at the time, he was in the process of communicating a description of the man over his radio. Wright testified that he had been in the Army and was a military police officer for five years. He asserted that he had "lots of training and classes on descriptions and gathering as much information as [he could]." He made an in-court identification of defendant as the man who shot him.

¶ 15 After being shot, Wright radioed for emergency assistance. Ultimately, he was hospitalized and underwent surgery. He recalled Heavin coming to his hospital room and showing

him two photographs. Wright testified he "instant[ly]" identified the person in the photographs as the shooter.

¶ 16        On cross-examination, Wright testified that he exited his squad car at the same time as the man exited the Buick. He acknowledged that there were no streetlights in the area where the foot pursuit began and he had never met or seen the man he was pursuing before. Wright also estimated that five or six seconds elapsed between when the man exited his vehicle and when shots were fired. He testified the man ran "back towards [his] direction" and his police car. Wright acknowledged that in his initial police report, which he dictated approximately a week after the shooting, he did not indicate that he observed any facial hair on the suspect. Further, he agreed that the only estimate he gave regarding distance was that he was "30 feet away."

¶ 17        On redirect examination, Wright reiterated that the suspect ran towards him after exiting the Buick. He asserted that the lights from his squad car illuminated the area where he and the suspect were "converging." Wright also explained that the "30 feet away" estimate from his police report referred to the distance between the Buick and his squad car.

¶ 18        Following Wright's testimony, no further evidence was presented. The parties presented argument to the trial court, which took the matter under advisement. In May 2019, the court heard additional argument on the motion and, in June 2019, it entered a written order, denying defendant's requests to suppress Wright's pretrial identification of him as the shooter and prohibit Wright from making an in-court identification during trial. In reaching its decision, the court found that both Heavin and Wright had testified credibly and Wright's identification was reliable "based on his independent memory of an incident occurring less than fourteen hours before." However, the court also found that law enforcement's "total noncompliance with the Lineup Statute" entitled defendant to (1) "call or to cross[-]examine any State witness who

participated in the decision not to comply with the Lineup Statute *** to assist the jury in its weighing of [Wright's] identification testimony" and (2) propose a jury instruction that, consistent with section 107A-2(j) of the Lineup Statute (725 ILCS 5/107A-2(j) (West 2016)), informed the jury that it could consider noncompliance with the Lineup Statute when weighing eyewitness identification testimony. Finally, the court stated it would reserve the issue of the admissibility of defense expert testimony on the issue of eyewitness identification should defendant choose to retain such an expert.

¶ 19    Defendant filed both a motion to reconsider and an amended motion to reconsider the trial court's ruling. In March 2022, the court entered a written order denying the motions.

¶ 20                                B. Jury Trial

¶ 21    In April 2023, defendant's jury trial was conducted. The record reflects that on the State's motion, the trial court dismissed three of the four attempted first degree murder counts against defendant and the State proceeded to trial on only one count of attempted first degree murder and the aggravated-battery count.

¶ 22    During the State's case-in-chief, Dan Monaco testified that in September 2017, he worked as a Winnebago County sheriff's deputy. During the late evening hours of September 22, 2017, he attempted to stop "a tan or gold Buick" for speeding. Monaco recalled the vehicle's license plate number but stated he was unable to execute the stop because the vehicle rapidly accelerated away from his location. Although Monaco did not see the driver's face, he was able to describe the driver as a Black male with a thin build, short hair, and a white T-shirt.

¶ 23    The State called Wright as a witness, and his testimony was substantially similar to the testimony he provided at the hearing on defendant's motion to suppress. He stated he was on duty during the early morning hours of September 23, 2017. Around 1:30 a.m., he saw a "tan

Buick" with a license plate that matched the one Deputy Monaco "had ran earlier in the night." The vehicle was registered to an individual named Nicholas Cadie. Wright described his attempt to initiate a traffic stop of the vehicle, his pursuit of the vehicle as it fled, and his pursuit of the individual who exited and ran from the vehicle after it stopped. He testified as follows:

"So as he exited the vehicle, he ran down to the ditch. I got within 15 feet of him. I was yelling, I was going to tase him, to stop. He had slipped and fell, so not all the way onto his stomach. He had caught himself with his hands. As he was pushing himself back up, he looked at me, I looked at him. That's when I started calling off on the radio, black male. And then as he was getting up, he *** fired three times at me."

¶ 24 Wright testified he was shot twice. The first shot went through his right shoulder, while the second shot went "in on the side of [his left] bicep" and through his left triceps. The shot through his right shoulder fractured his humerus bone in two places, leaving him unable to move his right arm. He described the injury to his left arm as "through and through" and stated it was bleeding heavily. His injuries required multiple surgeries and the placement of a metal plate and screws in his right arm. The bullet that hit his right shoulder was "still lodged underneath [his] collarbone" because it was close to the nerves in his neck and removal was too risky. Additionally, he was expected to require a full shoulder replacement in 10 to 15 years. The injury to his left arm created a wound that had to be "packed" daily for several months.

¶ 25 After being shot, Wright ran back toward his squad car and saw the shooter jump a fence. He testified that he had been able to observe the shooter "face to face" for "at least 3 or 4 seconds" while the two were within 15 feet of each other and Wright was "running at him." Wright made an in-court identification of defendant as the person who shot him.

¶ 26       On cross-examination, Wright agreed there were no streetlights in the area where he was shot and indicated he could not recall what the moon looked like or if there was any natural light. Besides "headlights" from the vehicles, the area was otherwise illuminated by his squad car's red and blue emergency lights. He agreed that he was shot within about five or six seconds of exiting his squad car. Wright also testified that in his police report, which was written about two weeks after the shooting, he stated he reached for his flashlight so that he could see where the suspect was before being shot. Wright explained that when the suspect fell in the ditch, "it was hard to see him down there" and he "couldn't see his hands." However, he could see the suspect once he got back up. Wright also agreed that he had been 30 feet away from the suspect when he first exited his squad car and he had never seen the suspect before.

¶ 27       Wright further testified that after the shooting, he was shown photographs of defendant and identified him as the shooter. He acknowledged that he was in the hospital at the time, had undergone surgery, and was on pain medication. On redirect examination, Wright testified that the emergency lights from his squad car were located on the top, side, front, and back of the car.

¶ 28       A recording from Wright's squad car's camera was admitted into evidence and played for the jury. The recording captured Wright's pursuit of the Buick, the roadway where the pursuit ended, audio of the shooting, and Wright's actions after the shooting but no image of the shooter outside the Buick. After the shooting, Wright could be heard on the recording describing the shooter as a tall, skinny, Black male.

¶ 29       The State's evidence also showed that three spent cartridge cases were discovered at the scene of the shooting in a grassy ditch. The State called Amanda Darnell, a forensic scientist with the Illinois State Police (ISP), as an expert in firearms identification. Darnell identified the

three cartridge cases found at the scene as being .40-caliber cases and determined that all three were fired from the same firearm.

¶ 30     Winnebago County Sheriff's Deputy Tim Speer testified he worked as a crime scene technician at the time of the shooting. While processing the Buick, he found a black plastic "bag and a receipt" on the floor of the Buick's front passenger area. Photographs admitted into evidence established that the receipt was dated September 22, 2017, at 7:13 p.m. The State's evidence showed defendant's fingerprint from his right index finger was found on the plastic bag. A .40-caliber magazine with 12 cartridge cases was also collected from the Buick's center console. One of defendant's fingerprints was similarly found on the magazine.

¶ 31     Blake Aper, an ISP forensic biology DNA analyst, testified for the State as an expert in DNA analysis. According to Aper, DNA analysis involved looking at "23 locations [in a DNA profile] that are found to be highly variable from person to person." He stated he swabbed items collected from the Buick for DNA, including a Chicago Blackhawks hat found on the front passenger seat, an iPhone connected to a charging cable found in the driver's seat, and two open drinking cans—a Crush soda can and a Sunkist soda can—collected from the center console cup holder. Aper found a mixture of two DNA profiles on the Blackhawks hat. One was a "major male profile" that matched defendant's DNA profile with a statistical frequency of "one in 1 quintillion." He also found a "two person mixture" on the iPhone. Aper identified "a major male profile at 21 out of 23 locations" on the iPhone that matched defendant's profile with a statistical frequency of "one in 1.2 octillion." Additionally, Aper explained that one complete male DNA profile was found on both open drinking cans. That profile matched defendant's DNA profile at all "the 23 locations" with a statistical frequency of "one in 78 nonillion."

¶ 32    Aper further testified that he tested swabs from the steering wheel and gear shifter of the Buick. Mixtures of DNA from different individuals were found in the swabs of both items. Because there was no "major contributor," Aper could not make a comparison to any known standard and deemed the results of testing on those items "inconclusive."

¶ 33    Samantha Chaves testified that in 2017, she and defendant were friends. On September 23 or 24, 2017, she received a call from defendant, who asked her to give him "a ride" from his aunt's house. Chaves recalled telling the police that when she picked defendant up, he sat in the back seat of her vehicle "with his back against the rear side driver's door with his legs up on the seat." She described defendant as "very quiet and crying" and stated that "he just kept telling [her] he f*** up." Chaves testified she and defendant "just kind of drove around" and that he told her "to go around the corner." After she complied, defendant got out of the car and retrieved a gun.

¶ 34    According to Chaves, something in her car began to overheat, so she and defendant switched to her other car, a gray Chevrolet Impala. Her friend Martica was also in the car. The group continued to drive around until defendant asked Chaves to drop him off at a BP gas station. At the gas station, Chaves saw defendant pull "a dark gray looking gun from under his right leg" and put it in a McDonald's bag. Defendant left her vehicle, taking the bag with him, and got into a minivan. The State presented surveillance video from the BP gas station taken on the afternoon of September 23, 2017, and showed Chaves screenshots taken from the video. Chaves identified defendant in the screenshots, noting he was wearing a black and white striped shirt. The gas station surveillance video was played for the jury and showed the individual Chaves identified as defendant exiting her vehicle with a brown paper bag, walking with a limp, and entering a parked minivan.

¶ 35    Chaves further testified that she later learned from the news and Facebook that defendant "had shot a police officer." She called defendant to ask him if what she heard was true and "why he did it." Chaves remembered telling the police that defendant "wouldn't really answer" but that he "got choked up and hung up the phone." Chaves recalled that after calling defendant, she was asked to drive to Schaumburg, Illinois, to pick up $500 that was intended for defendant. She also bought defendant a phone. Ultimately, however, Chaves never gave defendant the money or the phone.

¶ 36    Chaves acknowledged that she was charged with a felony offense based on her involvement in the case. In May 2021, she pleaded guilty to a misdemeanor offense and received "non-reporting probation." A condition of her probation was that she testify truthfully against defendant. Additionally, she agreed that her case was "up for expungement" and she had learned the State would not object to her case being expunged. Chaves further testified that she provided a statement to the police regarding defendant's case on September 25, 2017, "before any types of negotiations or deals" in her own case.

¶ 37    On cross-examination, Chaves testified that she had initially lied to the police before giving them a statement that had "[m]ore to it." She agreed that in exchange for her testimony against defendant, she was getting a "good deal from the State" that let her case "go off [her] record." She also agreed that during her phone call with defendant, he never told her anything and, instead, "just hung up." On redirect examination, Chaves testified she gave two statements to the police, and she agreed that the State never told her she needed "to come up with" a statement before she was given "any type of reduction of [her] charges."

¶ 38    Finally, the State presented testimony from David Witt, a detective with the Winnebago County Sheriff's Office. In October 2017, Witt was involved with the investigation

- 12 -

into Deputy Wright's shooting. He stated that after the shooting, defendant was arrested in Gwinnett County, Georgia.

¶ 39 During his case-in-chief, defendant first called Heavin to testify regarding the circumstances and procedures surrounding Deputy Wright's pretrial identification of the shooter. Heavin stated that during the underlying investigation, law enforcement officers spoke to Cadie, the owner of the Buick. They were then led to a particular house where they found individuals named Jarrion Moore and Ashley Gentry and developed defendant as a suspect in the case. Thereafter, a determination was made to "try to get an [identification] from Deputy Wright." To do so, officers located an August 2017 mug shot for defendant, as well as his "updated Facebook profile picture."

¶ 40 Heavin testified the sheriff's office had three different procedures for photographic identification: a photo lineup, a "show up," and showing someone "a single photo." He agreed that a photo lineup had to be conducted by "an independent administrator," *i.e.*, someone who was not involved in the case. A photo lineup also required a "six person array" that included the potential suspect and five other people who were similar in appearance. Additionally, a photo lineup identification should be video recorded if possible and include certain admonishments to the person being asked to make the identification. Heavin testified that a photo lineup was not conducted in the present case and the photo lineup procedures were not followed.

¶ 41 On cross-examination, Heavin testified that law enforcement conducted an extensive investigation in the case before showing Deputy Wright any photographs. Also, before making an identification, Wright described the shooter as being a Black male who was "really tall and skinny."

¶ 42      Gentry testified she was defendant's friend and had known him for about seven years. Around September 23 and 24, 2017, she was staying at a residence with defendant and an individual named "Jarrion." She recalled a morning when the "police swarmed inside" the residence. Gentry testified that only she and Jarrion were present. She stated the police officers acted aggressively and one shot a dog that was inside the residence. The officers also tackled Jarrion, "hitting him and kneeing him." Gentry stated she later saw Jarrion and noticed that "[h]is eye was almost swollen shut."

¶ 43      Defendant then called Wright as a witness. Wright testified that in his police report, he described the distance between where he exited his squad car and where defendant exited the Buick as being approximately 30 feet. He acknowledged that he did not mention a distance of 15 feet until later, "in preparation for a hearing." Wright testified that when he was in the hospital, Heavin showed him some photographs. At the time, he had undergone surgery and was on pain medication. He recalled that Heavin showed him two photographs of the same person. Wright testified Heavin did not show him a photo array, provide him with a "lineup advising form," or have an independent administrator with him. Also, as far as Wright knew, the interaction was not video recorded.

¶ 44      On cross-examination, Wright testified that Heavin showed him two photographs and asked him if he "recognized anyone in the photographs." He stated he felt "compelled" to identify the person in the photos "[b]ecause that was the person who shot [him]" and indicated that there was "no doubt in [his] mind" that the person in the photos was the shooter. Additionally, Wright asserted that when the identification occurred, it had been "a period of time" since his surgery and that he was coherent. Wright also described himself as being six feet, five inches tall.

¶ 45       Finally, the record shows defendant elected and was permitted to present testimony from Dr. Lawrence Todd White, an expert in eyewitness identification and human memory. During the trial and prior to Dr. White's testimony, the trial court and the parties discussed the permissible scope of Dr. White's expert testimony. The court noted that its understanding based on the supreme court's decision in *People v. Lerma*, 2016 IL 118496, was that an eyewitness identification expert could not "give opinions about the facts and circumstances specifically of the event itself." It further stated as follows:

> "[An expert] can basically testify to the research on things like straight from *Lerma*, the stress of the event itself, the use or presence of a weapon, the wearing of a partial disguise, exposure to post event information, nighttime viewing, cross racial identification. But I think the law is fairly clear that it's just his expert opinions on how those factors might affect a person's ability to accurately see or make an identification. It's not about whether Deputy Wright could—or did or did not make an accurate identification."

¶ 46       Ultimately, defendant's counsel agreed with the trial court, stating Dr. White had not "indicate[d] an ability to tell whether or not Deputy Wright accurately identified" defendant and, instead, had summarized "the reasons that the identification can be questioned based on the research." When the court reiterated that Dr. White had "to steer clear of making an expert opinion that Deputy Wright could never have identified [defendant]," defense counsel responded as follows: "No, we would not go there, Judge, just so it's clear."

¶ 47       During his testimony, Dr. White asserted that viewing time was one factor for consideration regarding an eyewitness's "ability to recall." He stated that studies consistently showed "that brief viewing times" were "associated with higher error rates." Studies also indicated

that identification errors were "common" when faces were viewed for less than 10 or 12 seconds. Lighting was similarly a relevant factor in the ability to recall, and identification errors become more common when lighting is poor. According to Dr. White, lighting "interact[ed] with distance," and "the combination of distance and lighting [was] crucial." Further, he stated that studies showed "quite consistently that persons who are experiencing a high level of stress and arousal are more likely to make mistakes when looking at faces or looking at a lineup."

¶ 48        Dr. White testified that human memories did not work like a video recording system. Rather, human memory is fallible, memories fade over time, and memories can be contaminated by new information that comes in at the time of recall. He stated that memory errors are common and "more common than most people realize." Additionally, he explained "the cross race effect," stating that studies had shown that eyewitnesses are generally better "at recognizing and remembering same race faces than they are the faces of other races." Dr. White testified that the error rate is 60% higher for witnesses trying to remember the face of someone of a different race than they are for witnesses looking at faces of the same race. (Evidence in the case indicated that defendant was Black and Wright was White.) Further, Dr. White testified that although studies showed police officers did better than civilians at accurately remembering crime scene details, there was no difference between police officers and civilians when it came to recognizing faces.

¶ 49        Dr. White also explained that identification procedures could affect eyewitness identifications. He stated a lineup that includes "the suspect and at least five fillers" was the favored identification procedure. A lineup, either live or with photographs, should be administered by a police officer who does not know the identity of the suspect so that the officer does not inadvertently influence the eyewitness. The person administering the lineup should caution the eyewitness by informing them that the suspect may not be present in the lineup.

¶ 50    On cross-examination, Dr. White testified that he had authored a report in the matter and reviewed certain materials, including reports from Wright and Heavin, transcripts of the hearings in the case, and an order of the trial court. He did not review the recording from Wright's squad car. He also did not "check the moonlight" in the area for the date of the incident and did not look at any evidence photos in the case. Dr. White also agreed that Wright's police report described the individual who shot him "as a tall, thinly built black male wearing [a] white and black shirt and dark colored pants, around six foot [*sic*], five [inches] or six foot [*sic*], six [inches] tall and weighing 160 or 170 pounds." He stated Wright provided a similar description at a later court hearing and estimated that the shooter was 26 or 27 years old. Further, Dr. White agreed that at the time of the offense, defendant "was 27 years old and weighed 170 pounds and stood six foot [*sic*], five [inches tall]." He acknowledged that the descriptions of the shooter that Wright provided were "remarkably consistent" with defendant.

¶ 51    The jury found defendant guilty of both attempted first degree murder and aggravated battery with a firearm. It also found proven the allegation that defendant personally discharged a firearm that proximately caused great bodily harm to another.

¶ 52                    C. Posttrial Proceedings and Sentencing

¶ 53    In May 2023, defendant, with the aid of his trial counsel, Kunal Kulkarni, filed a motion for a new trial or a judgment notwithstanding the verdict. Relevant to this appeal, defendant alleged prosecutorial misconduct based upon the State's cross-examination of Dr. White and that the trial court erred in denying his motion to suppress Deputy Wright's eyewitness identification of him as the shooter.

¶ 54    In June 2023, defendant obtained new counsel, attorney Stephen Richards, and in August 2023, he filed an amended motion for a new trial. He incorporated "all points made in" his

initial posttrial motion and, relevant to this appeal, argued (1) the State failed to prove him guilty beyond a reasonable doubt, (2) the trial court erred in denying his motion to suppress the eyewitness identification evidence, (3) the court erred in finding he could not introduce Dr. White's opinion that Wright's eyewitness identification was unreliable, (4) Kulkarni provided ineffective assistance by failing to submit a proffer of Dr. White's opinion that Wright's eyewitness identification was unreliable or seek the admission of such an opinion, (5) Kulkarni provided ineffective assistance by failing to have Dr. White review certain materials and consider certain information, (6) the State committed misconduct in its cross-examination of Dr. White, and (7) Kulkarni provided ineffective assistance by failing to object to the State's cross-examination of Dr. White.

¶ 55 In October and November 2023, the trial court conducted hearings on defendant's amended posttrial motion. Defendant called Kulkarni as a witness. He acknowledged that defendant had retained Dr. White to testify at trial as an expert in eyewitness identification and memory. He stated Dr. White authored a report regarding the case and conveyed information in his report during his testimony. Kulkarni stated Dr. White's testimony was important because "eyewitness testimony was a big part of [defendant's] case." He agreed that the supreme court's decision in *Lerma* established that, in some cases, "the defense could call an expert to testify about the general factors which bear on whether an eyewitness identification is reliable." However, Kulkarni did not believe that the case law extended as far as permitting an expert to render an opinion regarding "whether a particular eyewitness identification was reliable or not reliable."

¶ 56 Kulkarni testified that at his request, Dr. White included within his report an evaluation of whether Deputy Wright's identification of defendant was reliable and Dr. White opined that it was not. He stated he provided Dr. White with certain materials specific to

defendant's case but could not recall providing Dr. White with the squad car video, a picture of Wright's squad car, or other evidence photos. Kulkarni also had no memory of asking Dr. White "to check records of the moonlight" at the time and place of the shooting. He stated he did not recall his specific reasoning for not providing those materials to Dr. White but asserted that he believed the lighting conditions at the scene of the shooting were "quite clear in both the police reports and the transcripts." Further, Kulkarni believed that "at some stage" prior to trial he did make a proffer or ask the trial court to admit Dr. White's specific opinion that Deputy Wright's identification of defendant was unreliable.

¶ 57        Kulkarni testified that, "[l]ooking back," he should have challenged some of the State's cross-examination of Dr. White based on relevance given that Dr. White testified about the "general science" of eyewitness identification on direct examination and the State cross-examined him regarding materials specific to the case. However, he also testified that he had a strategic reason for not objecting, stating as follows:

> "[Dr. White] came across as a very calm, reassuring, I would say knowledgeable presence. I felt, in a way, the cross-examination of him was angry and blustering, and I think his calm presence actually appeared, shall I say, in a good light. And that was a factor to a degree."

Kulkarni stated he did not think about asking the trial court to reconsider its ruling regarding the scope of Dr. White's testimony based upon the State's questioning.

¶ 58        On cross-examination, Kulkarni testified that defendant's case was not "a single-finger [identification] case." Rather, the State presented additional evidence against defendant aside from Wright's identification, including DNA and fingerprint evidence and Chaves's testimony regarding defendant's actions after the shooting.

¶ 59    No other evidence was presented at the posttrial hearings and, following the parties' arguments, the trial court took the matter under advisement. On February 9, 2024, the court entered a written order denying defendant's amended posttrial motion.

¶ 60    In April 2024, the trial court conducted defendant's sentencing hearing. Defendant's presentence investigation report (PSI) showed he was 27 years old at the time of the shooting and 33 years old at the time of sentencing. His criminal history included various traffic-related offenses, a 2012 felony conviction for possession of a controlled substance, and a 2015 felony conviction for "Aggravated Fleeing to Elude." Defendant was sentenced to 24 months' probation in connection with his 2012 conviction and 30 months' probation in connection with his 2015 conviction. Both times, his probation was "Terminated Unsatisfactorily," and defendant was still on probation at the time of the charged offenses. Additionally, he reported a history of alcohol and drug abuse and that, from 2005 to 2020, he was affiliated with the Gangster Disciples street gang.

¶ 61    The PSI showed defendant's parents were never married and they separated when he was young. Defendant was primarily raised by his mother, who struggled with addiction. He reported that he witnessed domestic violence growing up. At times, his family was involved with the Illinois Department of Children and Family Services, and he was removed from his mother's care. Defendant reported that he had never been married but was the father of four children from two different relationships. The PSI showed he did not graduate high school but obtained his GED in 2021 while incarcerated. Defendant stated that he had been unemployed for one year at the time of his arrest for the underlying charges. According to the PSI, he had also previously reported that he had never held full-time employment.

¶ 62　　　　　The State presented victim impact statements from Deputy Wright and his wife but no additional evidence. Defendant presented an exhibit that included information about courses he had completed, numerous certificates he had earned while incarcerated, and a character letter from his sister, which defense counsel read into the record. Several family members also testified on defendant's behalf, including his mother, brother, 14-year-old son, and three cousins.

¶ 63　　　　　The parties agreed that defendant's offenses merged and he faced a sentencing range of 45 years to natural life in prison, *i.e.*, a sentencing range of 20 to 80 years in prison for attempted first degree murder of a police officer, plus a firearm enhancement of 25 years to life. The State asked the trial court to sentence defendant to a term of natural life in prison, while defendant's counsel asked the court to impose a sentence at or below the statutory minimum. The court sentenced defendant to 50 years in prison, plus a 25-year firearm enhancement, for a total sentence of 75 years in prison.

¶ 64　　　　　On April 30, 2024, defendant filed a motion to reduce his sentence, arguing the 75-year sentence imposed by the trial court was excessive "[g]iven his age and the substantial mitigating circumstances." Following a hearing in August 2024, the court denied the motion.

¶ 65　　　　　This appeal followed.

¶ 66　　　　　　　　　　　　　　II. ANALYSIS

¶ 67　　　　　　　　　　　　A. Sufficiency of the Evidence

¶ 68　　　　　On appeal, defendant first argues the evidence was insufficient to prove that he was the person who shot Deputy Wright. He contends Wright's eyewitness identification was unreliable and the remaining evidence otherwise failed to establish his guilt beyond a reasonable doubt.

¶ 69          "The State has the burden of proving beyond a reasonable doubt each element of an offense." *People v. Gray*, 2017 IL 120958, ¶ 35. "When reviewing a challenge to the sufficiency of the evidence, we must determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *People v. Harvey*, 2024 IL 129357, ¶ 19. In making that determination, this court must view the evidence in the light most favorable to the prosecution. *Id.* "All reasonable inferences are drawn in favor of a finding of guilt." *People v. Swenson*, 2020 IL 124688, ¶ 35.

¶ 70          Further, "[t]he trier of fact determines the credibility of the witnesses, decides what weight to give their testimony, resolves conflicts in the evidence, and draws reasonable inferences from that evidence." *Id.* ¶ 36. "A trier of fact is not required to disregard inferences that flow normally from the evidence before it, nor must the trier of fact search out all possible explanations consistent with innocence and raise those explanations to a level of reasonable doubt." *People v. Eubanks*, 2019 IL 123525, ¶ 95. On review, this court does not retry the defendant or "substitute our judgment for that of the trier of fact on questions involving the weight of the evidence or the credibility of witnesses." *People v. Conway*, 2023 IL 127670, ¶ 16. "A criminal conviction will not be overturned unless the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of the defendant's guilt." *Id.*

¶ 71          Here, defendant was found guilty of attempted first degree murder (720 ILCS 5/8-4(a), 9-1(a)(1) (West 2016)) and aggravated battery (*id.* § 12-3.05(e)(2)). To prove defendant's guilt as charged, the State was required to show that he knowingly shot Deputy Wright with the intent to kill him and he knew Wright was a peace officer performing his official duties. On appeal, defendant challenges only his identity as the shooter.

¶ 72          As stated, defendant initially contends Wright's identification was unreliable. He

argues Wright viewed the shooter's face for only a few seconds, in poor lighting conditions, while under stress, and under circumstances involving a "cross race" identification. Defendant argues that the unreliability of Wright's identification was supported by Dr. White's expert testimony. He also emphasizes that law enforcement did not follow the appropriate photographic lineup procedures.

¶ 73 Generally, "a single, positive identification by someone who had ample opportunity to observe the offender is sufficient to support a conviction." *Conway*, 2023 IL 127670, ¶ 18. In assessing eyewitness identification testimony, Illinois courts generally consider the factors set forth by the United States Supreme Court in *Neil v. Biggers*, 409 U.S. 188 (1972). *People v. Slim*, 127 Ill. 2d 302, 307 (1989). Those factors include:

> "(1) the opportunity the [witness] had to view the [offender] at the time of the crime; (2) the witness'[s] degree of attention; (3) the accuracy of the witness'[s] prior description of the [offender]; (4) the level of certainty demonstrated by the [witness] at the identification confrontation; and (5) the length of time between the crime and the identification confrontation." *Id.* at 308.

¶ 74 In this case, viewing the evidence in the light most favorable to the State, there was sufficient evidence from which the jury could have found Wright's identification reliable. Evidence showed Wright was in pursuit of the Buick and its driver, who was the shooter, suggesting a high degree of focus and attention on that individual. Although it was night and the location where the shooter exited the Buick had no streetlights, Wright testified the emergency lights on his squad car illuminated the area. Additionally, Wright stated he pursued the shooter on foot, coming within 15 feet of him, when the shooter slipped and fell into a ditch. Wright's testimony indicated he had the opportunity to observe the shooter's face for at least several seconds

and the two were "face to face" and looked at one another. Defendant points to testimony from Wright that he reached for his flashlight before being shot, which he argues suggests Wright could not see the shooter. However, Wright's testimony showed that his concern was that he could not see the shooter's hands after he fell, not that he had been unable to see the shooter's face.

¶ 75    Evidence also showed that before he was shown photographs of defendant, Wright provided descriptions of the shooter that were consistent with defendant's appearance. Shortly after the shooting, the recording from Wright's squad car camera captured him describing the shooter as a Black male who was tall and skinny. Heavin also testified that before Wright identified defendant, Wright described the shooter as being "really tall and skinny." Evidence in the case showed that defendant was a Black male, stood six feet, five inches tall, and weighed 170 pounds. Additionally, evidence showed Wright's identification of defendant occurred approximately 13 hours after the shooting, Wright "instant[ly]" identified defendant upon viewing his photograph, and Wright expressed a high level of certainty in his identification. Defendant argues that the identification procedures weighed against finding Wright's identification reliable and points to testimony from Wright that he felt "compelled" to identify the person in the photos. However, Wright explained that he felt that way because the person in the photographs "was the person who shot [him]."

¶ 76    As defendant notes, Dr. White offered testimony regarding the various circumstances under which identification errors were common or made at a higher rate, including brief viewing times, poor lighting, high levels of stress, "cross race" identifications, and identification procedures that failed to meet certain requirements. However, Dr. White's testimony did not preclude the jury from finding that Deputy Wright's testimony was credible and that his identification of defendant was nevertheless reliable. Such is particularly true considering the other

evidence presented in the case, which, as the State argues, strongly supports a finding that defendant was the shooter.

¶ 77 Notably, both defendant's DNA and his fingerprints were found on items inside the Buick. Defendant's DNA was found on a Blackhawks hat collected from the front passenger seat, an iPhone that was connected to a charging cable in the driver's seat, and two open drink cans located in cup holders at the front of the center console. Significantly, evidence indicated that Wright was shot with .40-caliber rounds, and defendant's fingerprint was found on a .40-caliber magazine collected from the Buick's center console. Additionally, a black plastic bag and a receipt were found on floor of the Buick's front passenger area. Defendant's fingerprint was found on the bag, and the receipt carried a date and time that was only hours before the shooting.

¶ 78 Finally, Chaves's testimony indicated she gave defendant a ride the same day as the shooting. She observed that defendant was "very quiet and crying" and stated that defendant "kept telling [her] he f*** up." Chaves observed defendant with a gun, which he placed in a McDonald's bag. She transported defendant to a gas station, where he exited her vehicle and got into a minivan, taking the bag with him. Evidence further indicated that defendant fled Illinois after the shooting and that he was arrested in Georgia. Portions of Chaves's testimony were corroborated with surveillance footage from the gas station, which showed defendant exiting Chaves's vehicle with a brown paper bag and entering a minivan on the day of the shooting.

¶ 79 The State presented strong and compelling evidence against defendant. Even putting aside Wright's identification of defendant as the shooter, the physical evidence, descriptions of the shooter, and Chaves's testimony all sufficiently supported a finding of his guilt. Accordingly, we disagree with defendant that the evidence was so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of his guilt and find defendant's challenge to the

sufficiency of the evidence lacks merit.

¶ 80                    B. Motion to Suppress Eyewitness Identification Evidence

¶ 81          Defendant next argues the trial court erred by denying his motion to suppress Deputy Wright's pretrial and in-court identifications of him as the shooter. He contends that (1) the identification procedure was impermissibly suggestive and violated his right to due process and (2) suppression was warranted based upon law enforcement's "egregious violations" of the Lineup Statute, *i.e.*, their failure to follow *any* of the requirements in the statute.

¶ 82          Identification evidence "must be excluded under the due process clause of the fourteenth amendment only where the pretrial encounter resulting in an identification was unnecessarily or impermissibly suggestive so that a very substantial likelihood exists that the offender was irreparably misidentified." *People v. Ayoubi*, 2020 IL App (1st) 180518, ¶ 29. Additionally, the Lineup Statute, which became effective in January 2015, sets forth the procedures for law enforcement lineups, including photo arrays. 725 ILCS 5/107A-0.1, 107A-2 (West 2016). Its requirements include that lineups are conducted with an independent administrator, unless such is not practical (*id.* § 107A-2(a)(1)); certain instructions are given to the eyewitness before the lineup (*id.* § 107A-2(e)(1)); at least five "fillers" are included in the lineup, in addition to the suspect (*id.* § 107A-2(f)(3)(C)); and that the lineup procedures are generally video recorded (*id.* § 107A-2(h)).

¶ 83          "Notably, the statute does not require suppression of a witness's identification to remedy a violation of the procedures outlined therein." *People v. Roberts*, 2020 IL App (1st) 172262, ¶ 32. Rather, it sets forth "consequences of *** noncompliance." 725 ILCS 5/107A-2(j) (West 2016). Regarding consequences, the statute provides as follows:

"All of the following shall be available as consequences of compliance or noncompliance with the requirements of this Section:

>(1) Failure to comply with any of the requirements of this Section shall be a factor to be considered by the court in adjudicating a motion to suppress an eyewitness identification or any other motion to bar an eyewitness identification. These motions shall be in writing and state facts showing how the identification procedure was improper. This paragraph (1) makes no change to existing applicable common law or statutory standards or burdens of proof.

>(2) When warranted by the evidence presented at trial, the jury shall be instructed that it may consider all the facts and circumstances including compliance or noncompliance with this Section to assist in its weighing of the identification testimony of an eyewitness." *Id.*

¶ 84 When a defendant files a motion to suppress identification evidence, he "has the burden to show that a pretrial identification was impermissibly suggestive." *People v. Brooks*, 187 Ill. 2d 91, 126 (1999). "The State may then overcome this showing by clear and convincing evidence that the witness is identifying the defendant based on his or her independent recollection of the incident." *Id.* In determining whether an identification has an independent origin, a court considers the *Biggers* factors:

>"(1) the opportunity of the witness to view the assailant at the time of the crime; (2) the witness'[s] degree of attention; (3) the accuracy of the witness'[s] prior description of the offender; (4) the level of certainty demonstrated by the witness

at the suggestive confrontation; and (5) the length of time between the offense and the suggestive confrontation." *Id.* at 129-30.

¶ 85 On review, a trial court's factual determinations will not be reversed unless they are against the manifest weight of the evidence, while the court's ultimate determination regarding the suppression of evidence is reviewed *de novo*. *People v. Lawson*, 2015 IL App (1st) 120751, ¶ 39. Additionally, "[i]n affirming the trial court's ruling on a motion to suppress, reviewing courts may consider evidence presented at both the suppression hearing and trial." *Ayoubi*, 2020 IL App (1st) 180518, ¶ 31.

¶ 86 Here, defendant filed a motion to suppress Deputy Wright's identification of him as the shooter. The trial court denied the motion, finding that although the procedure used to obtain Wright's identification of defendant was impermissibly suggestive, the State had established that the identification was reliable based on Wright's "independent memory" of the incident. We find no error by the court.

¶ 87 Initially, there is no dispute on appeal that the procedures used to obtain Deputy Wright's identification of defendant failed to comply with the Lineup Statute. Defendant suggests that when, like in this case, there has been a failure to follow *any* of the statutory identification procedures, suppression should be required. We disagree and note the Lineup statute contains no such requirement. Rather, it identifies "consequences" of noncompliance, including the court's consideration of such noncompliance when adjudicating a motion to suppress. 725 ILCS 5/107A-2(j) (West 2016). It also explicitly states that its provisions do not change the "existing applicable common law," which requires a court to determine whether a lineup procedure was impermissibly suggestive and whether the identification was, nevertheless, based on a witness's independent recollection of the incident. *Id.* Here, the trial court clearly engaged in the proper analysis,

considering law enforcement's "total noncompliance" with the Lineup Statute when ruling on defendant's motion to suppress and finding that although the underlying lineup procedure was impermissibly suggestive, Wright's identification of defendant was based on Wright's independent memory of what had occurred. The court was required to do no more under the circumstances presented.

¶ 88 Further, in denying defendant's motion to suppress, the trial court stated that it had relied on Wright's testimony, which it found credible. In relation to the *Biggers* factors, Wright's testimony showed he had an opportunity to view the shooter while pursuing him on foot. He acknowledged that the incident occurred in the early morning hours while it was "dark out." However, he asserted that the emergency lights on his squad car "were lighting up the area." Wright observed the shooter slip and fall into a ditch as he was about 15 feet away and "getting closer." As the shooter was getting up, he and Wright looked at one another and made eye contact for a few seconds. The evidence indicated that Wright was highly focused on the shooter and that he was in the process of communicating the shooter's description over his radio when he was shot.

¶ 89 At the suppression hearing, Deputy Wright described the shooter as being a Black male, 26 or 27 years of age, tall and skinny, and with short hair. Wright—who the evidence at trial showed was six feet, five inches tall—more specifically estimated that the shooter was about his same height and 150 pounds. He also described the shooter as wearing black pants and a white and black shirt. Evidence in the record showed defendant was a Black male, 27 years old at the time of the offense, the same height as Deputy Wright—six feet, five inches tall, and 170 pounds. Surveillance footage admitted at trial showed that on the day of the shooting, defendant had short hair and was wearing clothing consistent with Wright's description. The evidence at trial further established that before ever seeing defendant's photographs, Wright provided descriptions of the

shooter that were consistent with defendant's appearance, *i.e.*, a Black male, who was "really tall and skinny."

¶ 90      Additionally, evidence showed that Wright's identification of defendant occurred approximately 13 hours after the shooting. Both Wright and Heavin testified that Wright "instant[ly]" or immediately identified defendant as the shooter when shown defendant's photographs.

¶ 91      The trial court had the opportunity to observe Deputy Wright's testimony, and the record fails to reflect that its credibility determination was against the manifest weight of the evidence. Additionally, based on the evidence presented, we find no error in the court's determination that the evidence weighed in favor of finding Wright's identification was based upon his independent recollection of the incident and denial of defendant's motion to suppress.

¶ 92      Notably, in denying suppression, the trial court also imposed an additional "consequence" provided for in the Lineup Statute (725 ILCS 5/107A-2(j) (West 2016)) by inviting defendant "to propose a written jury instruction informing the jury that 'it may consider all of the facts and circumstance including compliance or noncompliance with [the Lineup Statute] to assist it in weighing the identification testimony given by Deputy Wright." Ultimately, the court instructed the jury that in determining the weight to be given the identification evidence, it "should consider all of the facts and circumstances under which the identification was made, including, but not limited to the procedures not used by the law enforcement agency." Defendant was also permitted to present expert witness testimony regarding the reliability of eyewitness identifications. Thus, he was permitted to inform the jury of, and fully explore, the circumstances of Wright's identification that he claims made it unreliable. Given the facts presented, we find no error.

¶ 93      C. Limitations on Eyewitness Identification Evidence

¶ 94    Defendant next argues the trial court improperly limited Dr. White's expert testimony. Specifically, he asserts the court erred in barring Dr. White from offering his opinion that Deputy Wright's identification of him as the shooter was not reliable. He cites *Lerma*, 2016 IL 118496, ¶ 24, wherein the supreme court recognized that the research concerning eyewitness identifications was "well settled, well supported, and in appropriate cases a perfectly proper subject for expert testimony." Defendant also relies on Illinois Rule of Evidence 704 (eff. Jan. 1, 2011) for the proposition that an expert witness may appropriately opine on ultimate issues of fact in a case.

¶ 95    Illinois Rule of Evidence 702 (eff. Jan. 1, 2011) provides, "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Rule of Evidence 704 states, "Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Ill. R. Evid. 704 (eff. Jan. 1, 2011).

¶ 96    Generally, a trial court's decision regarding whether to admit evidence, including expert witness testimony, is reviewed for an abuse of discretion. *Lerma*, 2016 IL 118496, ¶ 23. "An abuse of discretion occurs only where the trial court's decision is arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it." (Internal quotation marks omitted.) *Id.*

¶ 97    Notably, however, although defendant challenges the trial court's decision as to the scope of Dr. White's testimony on appeal, the record indicates that, at trial, he raised no objection

with the court and, in fact, agreed with the court's ruling. "It is well established that, where a party acquiesces in proceeding in a particular manner, 'he is not in a position to claim he was prejudiced thereby.' " *People v. Hernandez-Chirinos*, 2024 IL App (2d) 230125, ¶ 76 (quoting *People v. Villarreal*, 198 Ill. 2d 209, 227 (2001)). "This concept, known as the doctrine of invited error or acquiescence, provides that 'a party cannot acquiesce to the manner in which the trial court proceeds and later claim on appeal that the trial court's actions constituted error.' " *Id.* (quoting *People v. Hibbler*, 2019 IL App (4th) 160897, ¶ 60).

¶ 98　　　The record shows that before defendant called Dr. White as a witness, the trial court and the parties discussed the appropriate scope of his testimony. During those discussions, the State asserted its belief that Dr. White could not "give an opinion as to whether or not Deputy Wright was able to identify *** defendant." The trial court agreed. In response, defendant's counsel represented that Dr. White's report had not indicated that he had "an ability to tell whether or not Deputy Wright accurately identified [defendant]." Additionally, counsel responded to the court's assertion that Dr. White could not opine that Wright "could never have identified [defendant]" by stating as follows: "No, we would not go there, Judge, just so it's clear." In presenting Dr. White's testimony, defendant did not attempt to elicit any opinions regarding either the accuracy or the reliability of Wright's specific identification of defendant.

¶ 99　　　Accordingly, not only does the record show defendant acquiesced to the trial court's determination of the proper scope of Dr. White's testimony, but it also indicates that he did not seek the admission of an opinion from Dr. White that Deputy Wright's identification was unreliable. We note that defendant does not cite any portion of the record where he argued in favor of admitting such an opinion. Because defendant agreed to the procedures undertaken below and

did not seek to present the evidence he asserts was improperly excluded, he cannot now claim that error occurred.

¶ 100　　　　Further, even setting aside defendant's acquiescence, as the State points out on appeal, defendant's same argument has been rejected by another district of the appellate court. Like in this case, in *People v. Corral*, 2019 IL App (1st) 171501, ¶ 101, the defendant relied on *Lerma* and Illinois Rule of Evidence 704 in arguing that the trial court erred by barring his expert "from testifying regarding her opinion of [an eyewitness's] identification of [the] defendant." In finding no abuse of the trial court's discretion, the First District noted that "[w]hile the express issue of whether an eyewitness expert could ultimately opine on the reliability of another witness's identification of an offender was not discussed in *Lerma*, under Illinois law, it is generally improper to ask one witness to comment directly on the credibility of another witness." *Id.* ¶ 113. The court concluded "that the trial court did not err in prohibiting [the defendant's expert] from testifying and rendering her opinion as to the reliability of [the eyewitness's] identification, especially where such testimony is clearly a function of the jury, not a purported expert." (Internal quotation marks omitted.) *Id.* ¶ 114. Additionally, the court deemed the defendant's reliance on Illinois Rule of Evidence 704 "unpersuasive." *Id.* ¶ 115.

¶ 101　　　　Defendant responds that *Corral* was wrongly decided and should not be followed. However, even assuming, *arguendo*, that defendant is correct and that error occurred, we find that any error was harmless beyond a reasonable doubt. The supreme court has identified three approaches to determining whether harmless error has occurred: "(1) whether the error contributed to the defendant's conviction; (2) whether the other evidence in the case overwhelmingly supported the defendant's conviction; and (3) whether the excluded evidence would have been duplicative or cumulative." *Lerma*, 2016 IL 118496, ¶ 33.

¶ 102    In this case, all three approaches favor a finding of harmless error. Although Dr. White did not offer the opinion that Deputy Wright's identification of defendant was unreliable, he was permitted to testify as an expert in eyewitness identification and human memory. He provided relevant and probative testimony that demonstrated the facts and circumstances under which eyewitness identifications are associated with high error rates and are, therefore, less likely to be reliable. Each factor and circumstance he described was present or arguably present in Deputy Wright's underlying identification of defendant. Thus, while Dr. White did not explicitly opine that Wright's identification was unreliable, such was the clear import of his testimony. Additionally, as discussed, the other evidence in the case against defendant was strong and compelling. That evidence included Wright's descriptions of the shooter prior to viewing defendant's photographs, the fingerprint and DNA evidence found in the Buick, Chaves's testimony regarding her observation of and interactions with defendant after the shooting, and defendant's flight from Illinois.

¶ 103                    D. Ineffective Assistance of Counsel

¶ 104    On appeal, defendant also argues that Kulkarni, his trial counsel, provided ineffective assistance in presenting Dr. White's expert testimony. Specifically, he contends that Kulkarni failed to (1) provide Dr. White with necessary and important materials for his review, including Wright's squad car video and photographs of the scene, (2) object to the State's cross-examination of Dr. White on relevancy grounds, and (3) introduce Dr. White's "specific application of the factors in his report to Wright's identification" after the State "opened the door" to such evidence on cross-examination.

¶ 105    Ineffective-assistance-of-counsel claims are evaluated under the two-prong test set forth by the United States Supreme court in *Strickland v. Washington*, 466 U.S. 668 (1984). *People*

*v. Torres*, 2024 IL 129289, ¶ 26. To prevail, "a defendant must show (1) that his attorney's representation fell below an objective standard of reasonableness and (2) that a reasonable probability exists that, but for counsel's errors, the result of the proceeding would have been different." *Id.* ¶ 27. "A defendant's failure to satisfy either prong of the *Strickland* standard precludes a finding of ineffective assistance of counsel." *Id.*

¶ 106        Here, defendant cannot satisfy *Strickland*'s prejudice prong, *i.e.*, a reasonable probability that the result of his trial would have been different but for Kulkarni's alleged errors. As indicated, even absent counsel's alleged errors, Dr. White offered relevant and probative testimony regarding the reliability of eyewitness identifications, which could have supported a finding that Deputy Wright's identification of defendant was not reliable. Additionally, even without Deputy Wright's identification of defendant as the shooter, the outcome of defendant's trial would have been the same. Evidence in the case showed that prior to viewing defendant's photographs, Wright, who was himself six feet, five inches tall, described the shooter as a Black male, who was "really tall and skinny." Defendant, a Black male standing six feet, five inches tall and weighing 170 pounds, fit that description. Deputy Monaco, who attempted to stop the Buick hours before the shooting, similarly provided a description of the shooter as a Black male with a thin build, short hair, and wearing a white T-shirt. Notably, defendant was captured on gas station surveillance video hours after the shooting, appearing with short hair and wearing a black and white T-shirt.

¶ 107        As set forth above, evidence additionally indicated that Deputy Wright was shot with .40-caliber rounds and defendant's fingerprints were found on a .40-caliber magazine collected from the Buick's center console. Defendant's fingerprint was also found on a black plastic bag collected from the floor of the Buick's passenger area. The bag was found along with

a receipt dated and time stamped only hours before the shooting. Defendant's DNA was on a hat collected from the Buick's front passenger seat, on an iPhone found in the driver's seat and connected to a charging cable, and on two open drink cans collected from cup holders at the front of the center console. Chaves testified that in the hours after the shooting, defendant asked her for a ride from his aunt's house. She observed that he was crying, heard him repeatedly state that he had "f*** up," and saw him in possession of a gun. Finally, evidence also indicated defendant fled Illinois after the shooting.

¶ 108    Because defendant cannot show prejudice, he cannot establish that Kulkarni provided ineffective assistance. Accordingly, defendant's claim lacks merit.

¶ 109                                E. Excessive Sentence

¶ 110    Finally, on appeal, defendant argues that the trial court erred in sentencing him to 75 years in prison. He contends his sentence was excessive, given that he was a 27-year-old with no prior violent record when the offenses occurred. Defendant also points to his "horrific upbringing," potential for rehabilitation, and family support.

¶ 111    The Illinois Constitution requires that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. "The trial court must base its sentencing determination on the particular circumstances of each case, considering such factors as the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age." *People v. Fern*, 189 Ill. 2d 48, 53 (1999). The court "has broad discretionary powers in imposing a sentence, and its sentencing decisions are entitled to great deference." *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). "We will not substitute our judgment for the trial court's merely because we might have weighed these factors differently." *People v. Turner*, 2024 IL App (4th) 230641,

¶ 57. Also, "[a]bsent explicit evidence to the contrary, we *** presume the [trial] court considered all mitigating factors." *People v. Page*, 2022 IL App (4th) 210374, ¶ 52.

¶ 112     "The standard of review when a defendant contends his sentence is excessive is whether the trial court's sentencing determination constituted an abuse of discretion." *People v. Schnoor*, 2019 IL App (4th) 170571, ¶ 99. "An abuse of discretion will be found where the sentence is greatly at variance with the spirit and purpose of the law[ ] or manifestly disproportionate to the nature of the offense." (Internal quotation marks omitted.) *People v. Snyder*, 2011 IL 111382, ¶ 36; see *Fern*, 189 Ill. 2d at 54 ("A sentence within statutory limits will not be deemed excessive unless it is greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense.").

¶ 113     Here, defendant does not dispute that he faced a sentencing range of 20 to 80 years in prison, plus a firearm enhancement of 25 years to life in prison. 720 ILCS 5/8-4(c)(1)(A), 8-4(c)(1)(D) (West 2016). The trial court imposed a sentence well within that range: 50 years in prison, plus a 25-year firearm enhancement. As evidence in aggravation, the court stated that defendant's conduct threatened serious harm, noting he was involved in a high-speed car chase, at night, "through many, many different streets," and that he crossed the median of a roadway into oncoming traffic. It also considered defendant's criminal history, which included two prior felony convictions and noncompliance with probation, as well as the fact that defendant was still on probation at the time of the underlying offenses. The record reflects the court further relied on the serious and "senseless" nature of the offenses.

¶ 114     On review, defendant points to mitigating evidence presented in the case. However, the record supports a finding that the trial court weighed and considered that evidence when determining his sentence. Given the seriousness of the offense and evidence in aggravation, we

cannot say that the sentence the court imposed was either greatly at variance with the spirit and purpose of the law or that it was manifestly disproportionate to the nature of the offense for which defendant was sentenced—attempted first degree murder of a police officer. Accordingly, we find no abuse of discretion by the court.

¶ 115                                   III. CONCLUSION

¶ 116            For the reasons stated, we affirm the trial court's judgment.

¶ 117            Affirmed.